## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

GENWORTH LIFE AND ANNUITY                    Case No. 1:22-cv-435
INSURANCE COMPANY,                            Litkovitz, M.J.
     Plaintiff,

    vs.

ROBERT ALLEN CASE, *et al.*,                  **ORDER**
     Defendants.

Plaintiff Genworth Life and Annuity Insurance Company (Genworth) initiated a complaint for interpleader on July 26, 2022, alleging that defendants Robert Allen Case (Case) and Lori A. Stewart (Stewart) assert conflicting claims to a $500,000.00 death benefit under a life insurance policy (Policy) that it issued to Leslie R. Case (decedent). (*See generally*, Doc. 1). Case is the decedent's surviving spouse, and Stewart is the decedent's sister. Case and Stewart each filed crossclaims. (*See* Docs. 25,[1] 59). This matter is before the Court on Case's motion for partial summary judgment on his amended crossclaim (Doc. 71), Stewart's response (Doc. 75), and Case's reply (Doc. 78); and Stewart's motion for summary judgment on all counts of Case's amended crossclaim (Doc. 74), Case's response (Doc. 77), and Stewart's reply (Doc. 79).

A. <u>Factual background</u>

Case and the decedent were married on June 30, 2007. (Case Dep. 40:9-11, Doc. 74-1 at PAGEID 1974). In 2012, the decedent obtained the Policy, which had an "Initial Specified Amount of $500,000.00." (Compl. for interpleader, Doc. 1 at PAGEID 2, ¶ 6). The decedent also had a TD Ameritrade Roth IRA valued at between $24,000.00 and $25,000.00. (Doc. 71-4

---

[1] The Court granted Case's motion to dismiss Stewart's amended crossclaim (Doc. 32). (*See* Doc. 43).

at PAGEID 812).[2]  In November of 2021, Case's mother passed away, and on December 30, 2021, the decedent was diagnosed with cancer.  (Case Dep. 48:21-24, Doc. 74-1 at PAGEID 1982).

On May 2, 2022, Stewart came to Case and the decedent's home (marital home) to drop off dinner, had a conversation with the decedent, and left briefly.  When Stewart returned, she was accompanied by a local sheriff's deputy.  Stewart gathered some of the decedent's belongings and moved her out of the marital home.  (Case Dep. 69:25-72:2, Doc. 74-1 at PAGEID 2003-06; Stewart Dep. 41:2-9, 61:19-63:7, Doc. 71-6 at PAGEID 879, 899-901).  The decedent moved in with Stewart.  (Stewart Dep. 67:16-20, Doc. 71-6 at PAGEID 904).

The parties' accounts of what led to this May 2, 2022 separation differ dramatically.  According to Case, he was blindsided.  (*See* Case Dep. 75:12-25, Doc. 74-1 at PAGEID 2009 (Case and the decedent had never previously discussed divorce or spent more than a few nights apart during their marriage), 58:1-25, PAGEID 1992 (the couple experienced no major marital strife or tension between the decedent's cancer diagnosis and May 2, 2022, except that the decedent expressed that their bed was uncomfortable)).  (*See also* Ertel Dep. 34:13-39:1, 44:13-17, Doc. 71-8 at PAGEID 1215-20, 1225 (a friend and next-door neighbor of the decedent's explaining that she, her husband, and Case were "shocked" and "flabbergasted" by the separation); Hellman Dep. 28:19-30:12, Doc. 71-7 at PAGEID 1143-45 (a friend of the

---

[2] In her response to Case's motion, Stewart challenges the authenticity of several exhibits to Case's motion, including this one.  (*See* Doc. 75 at PAGEID 2999-3001).  Document 71-4, which is a 2022 TD Ameritrade statement of "Lori Stewart Bene Roth IRA of [the decedent]" reflecting year-to-date direct distributions totaling $24,587.66, was produced by Stewart.  If a document is produced by an opposing party during discovery, "'there [is] sufficient circumstantial evidence to support its authenticity' at trial."  *Churches of Christ in Christian Union v. Evangelical Benefit Tr.*, No. C2:07-cv-1186, 2009 WL 2146095, at *5 (S.D. Ohio Jul. 15, 2009) (alteration in original) (quoting *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir. 1991)).  "[I]t is disingenuous for [a party] to object to copies of documents that [the party] produced to [the opposing party] pursuant to discovery requests."  *Id.* (quoting *U.S. v. Cinergy Corp.*, 495 F. Supp. 2d 909, 914 (S.D. Ind. 2007)).  Stewart also testified that the TD Ameritrade Roth IRA had a value of approximately $24,000.00.  (Stewart Dep. 109:12-21, Doc. 71-6 at PAGEID 947).

decedent's describing she, her husband's, and Case's shock at the decedent's departure, and stating that she "never, ever got the inkling that [the decedent] was unhappy.")).

According to Stewart, the decedent had grown unhappy in her marriage due to the stress of caring for Case's mother before she died and finances. (Stewart Dep. 24:5-18, 28:9-21, 29:5-19, Doc. 71-6 at PAGEID 862, 866-67). After her cancer diagnosis, the decedent believed that Case's primary focus was making financial arrangements as opposed to her well-being. (*See* Fries Dep. 13:13-15:6, Doc. 74-3 at PAGEID 2567-68 (the decedent's co-worker testified that, according to the decedent, Case was preoccupied with changing the title on the house and screening the decedent's mail); Schirmer Dep. 46:13-25, Doc. 71-15 at PAGEID 1475 (the decedent's sister testified that the decedent reported being unhappy, and that Case had reacted to her diagnosis primarily by worrying over finances)).

On May 3, 2022, the day after she left the marital home, Case texted the decedent: "I want you to know that I love you and have only wanted what is best for you. . . .  I sincerely apologize for whatever I've done. . . .  . . .  If you need something from home, let me know. . . ." (Ex. 5 to Case Dep. Doc. 74-1 at PAGEID 2063). The decedent responded: "I cannot live in your negativity any longer. I won't. . . . I've contacted a divorce attorney. I will not live like this any longer." (*Id.*). Also on May 3, 2022, Stewart and the decedent went to PNC Bank to close out the decedent's personal account and open two new accounts with Fifth Third Bank. (Stewart Dep. 126:10-15; Doc. 71-6 at PAGEID 965).

On May 4, 2022, Case met with a divorce attorney. (Case Dep. 75:7-9, Doc. 74-1 at PAGEID 2009). Also on May 4, 2022, Case and the decedent separately spoke with their financial advisor at FFR Wealth, Scott Reynolds. The decedent informed Mr. Reynolds about their divorce, her desire to change the beneficiaries on the Policy and TD Ameritrade Roth IRA,

and her desire to change her Power of Attorney (POA) to Stewart.  (Reynolds Dep. 48:21-50:22, Doc. 74-6 at PAGEID 2709-10).  Mr. Reynolds' notes related to this case state: "Feeling [Case] not supportive / positive enough when they learned her diagnosis, to[o] worried about getting all finances in place etc. instead of being positive and finding a way to win the battle as long as they can."  (*Id.*, Ex. 1 at PAGEID 2736).  Case asked that Mr. Reynolds stop automatically funding his and the decedent's Roth IRAs.  (Reynolds Dep. 43:6-21, Doc. 74-6 at PAGEID 2708; Case Dep. 107:23-108:8, Doc. 74-1 at PAGEID 2401-02).

On May 16, 2022, the decedent's divorce attorney, Darrin Nye, filed a Complaint for Divorce on her behalf against Case in the Hamilton County Domestic Relations Court.  (*See* Doc. 71-9 at PAGEID 1262).[3]  Upon the filing of this complaint, a temporary restraining order (TRO) issued that read in part:

> IT IS HEREBY ORDERED PURSUANT TO LOCAL RULE:
>
> . . . .
>
> So as not to defeat the other party in obtaining an equitable division of marital property, a distributive award, or spousal or other support, both *Plaintiff and Defendant* are also restrained and enjoined from:
> 3. Directly or indirectly changing, terminating, lessening the value of or failing to renew the present . . . life . . . insurance coverage or removing the other party as a beneficiary on any policy or retirement benefits;
>
> . . . .
>
> 5. Encumbering, disposing of, selling, damaging, destroying, lessening the value of, or in some manner secreting the marital assets of the parties including, but not limited to: real estate, household furniture and furnishings, appliances, automobiles, or other vehicles of the parties;
> 6. Withdrawing, spending, or encumbering funds in any financial institution or entering a safe deposit box, however, *this Order shall not prevent the payment of ordinary and necessary business expenses and living expenses consistent with the*

---

[3] Stewart challenges the authenticity of the exhibit attached to Case's motion containing documents related to the divorce complaint (Doc. 71-9), but attorney Nye authenticated these documents in his affidavit.  (*See* Doc. 71-10 at PAGEID 1307, ¶¶ 10-11 (copies of the complaint and temporary restraining order attached at PAGEID 1318-20)).

> *practice of the parties during the marriage and shall not prevent the payment of necessary and reasonable attorney fees, litigation and court costs in this action.*

(Doc. 74-10 at PAGEID 1320).

On May 24, 2022, the decedent signed a document designating Stewart as her POA, and she signed a second such document on May 27, 2022—this one also designating Stewart as her POA but also expressly revoking prior POAs.  (Docs. 71-11 and 71-23).[4]  Stewart hired attorney Esther Norton to prepare the second POA, and attorney Norton did not represent the decedent. (Norton Dep. 9:19-10:15, Doc. 71-12 at PAGEID 1335-36).  On May 28, 2022, Case testified that he overheard Stewart at PNC Bank attempting to freeze his and the decedent's joint bank accounts with the POA.  (Case Dep. 102:13-103:7, Doc. 74-1 at PAGEID 2036-37).

On May 29, 2022, attorney Norman Litts witnessed the decedent's signatures on the change of beneficiary designation forms for the Policy and TD Ameritrade Roth IRA, designating Stewart instead of Case.  (Ex. C to Litts Dep., Doc. 74-8 at PAGEID 2946-2950). On May 30, 2022, Stewart sent these forms to Mr. Reynolds.  (Reynolds Dep. 20:6-21:4, Doc. 71-21 at PAGEID 1689-90).

The decedent passed away on May 31, 2022.  (Doc. 71-5 (Ohio Department of Health Certificate of Death)).[5]  There was no public funeral or published obituary; Stewart did not

---

[4] Stewart challenges the authenticity of these documents, but the May 24, 2022 POA (Doc. 71-11 at PAGEID 1325) and May 27, 2022 POA (Doc. 71-23 at PAGEID 1776) are notarized.  *See* Fed. R. Evid. 902(8) ("A document accompanied by a certificate of acknowledgment that is lawfully executed by a notary public" is self-authenticating); *Ingels v. Warden, N. Cent. Corr. Inst.*, No. 1:21-cv-561, 2022 WL 17252210, at *1 (S.D. Ohio Nov. 28, 2022) ("It is notarized on January 16, 2019, so it satisfies Rule 902 and is self-authenticating.").  Both Stewart and attorney Esther Norton authenticated the May 24, 2022 POA in their depositions.  (Stewart Dep. 155:7-156:4, Doc. 71-6 at PAGEID 993-94; Norton Dep. 14: 2-15:25, Doc. 71-12 at PAGEID 1340-41).  Attorney Norton also authenticated the May 27, 2022 POA in her deposition.  (Norton Dep. 12:0-24, Doc. 71-12 at PAGEID 1338).
[5] Stewart disputes the authenticity of this document, but the copies of the death certificate and correction thereto are self-authenticating public records because they are copies of certified records with signatures confirming their authenticity and seals from the Ohio Department of Health.  (Doc. 71-5 at PAGEID 815-19, 824-33).  Self-authenticating evidence includes "a copy of an official record . . . if the copy is certified as correct by: . . . (B) a certificate that complies with Rule 902(1), (2), or (3). . . ."  Fed. R. Evid. 902(4).  Rule 902(1) in turn provides that self-authenticating evidence includes documents bearing "(A) a seal purporting to be that of . . . any state . . . ; . . . or

5

notify Case about the decedent's death or funeral; and Case did not attend the funeral.  (Stewart Dep. 98:8-101:5, Doc. 71-6 at PAGEID 936-39).  After her passing, Stewart continued using the decedent's POA and her debit card (*Id.* at 107:17-108:22, 131:2-134:21, PAGEID 945-46, 969-72).  Stewart had the decedent's cell phone and eventually took it to Best Buy to have its contents deleted around March of 2023—after Genworth filed its complaint for interpleader.  (*Id.* at 188:17-190:19, PAGEID 1026-28).

FFR Wealth processed the disbursement of the TD Ameritrade IRA to Stewart.  (*Id.* at 109:9-21, PAGEID 947).[6]  Genworth did not disburse the Policy's death benefit because Case, through counsel, wrote to Genworth to contest any changes to the beneficiary designation on the Policy made after May 2, 2022.  (Doc. 1-7).  Also in June 2022, Stewart received a $10,000 death benefit from the decedent's employer, Proctor & Gamble.  Stewart was not the executor of the decedent's estate, but she had to obtain an estate EIN number from the IRS to receive this benefit, and the IRS corresponded with her as the though she was the executor of the decedent's estate.  (Stewart Dep. 162:7-165:14, 173:10-177:5, Doc. 71-6 at PAGEID 1000-03, 1011-15).

Case's amended crossclaim asserts a tortious interference with expectancy of inheritance claim[7] as it relates to the Policy and TD Ameritrade Roth IRA (Count I); a conversion claim related to the Policy, TD Ameritrade Roth IRA, and marital bank account proceeds (Count II)[8]; a claim for civil liability and treble damages under Ohio Revised Code §§ 2307.60 and 2307.61

---

a department, agency, or officer of any entity named above; and (B) a signature purporting to be an execution or attestation."

[6] This took place on or before early July of 2022, according to the TD Ameritrade correspondence attached to Stewart's response showing the disbursements of the TD Ameritrade Roth IRA proceeds to herself and her siblings. (*See* Doc. 75-1).

[7] The Supreme Court of Ohio recognized this tort as "*intentional* interference with expectancy of inheritance[,]" *Firestone v. Galbreath*, 616 N.E.2d 202, 203 (Ohio 1993) (emphasis added), but Ohio courts use "tortious" and "intentional" interchangeably when discussing this claim.  *See, e.g.*, *Grimes v. Grimes*, Nos. 06CA56, 06CA73, 879 N.E.2d 247, 254 (Ohio Ct. App. 2007) (citing *Firestone* and noting that "Ohio courts . . . recognize the claim of *tortious* interference with an expectancy of inheritance.") (emphasis added).

[8] Case has withdrawn his conversion claim as it pertains to personal property.  (*See* Doc. 77 at PAGEID 3023 n.3).

premised on a violation of Ohio Revised Code § 2913.02(A) (Count III); an intentional infliction

of emotional distress claim (Count IV); and a claim for a declaratory judgment that he is the

rightful, 100% beneficiary of the Policy and TD Ameritrade Roth IRA (Count VI).  Case also

seeks punitive damages as it relates to Counts I, II, and IV (Count V).

     B.  <u>Summary judgment standard</u>

A motion for summary judgment should be granted if the evidence submitted to the Court

demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled

to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A grant of summary

judgment is proper unless the nonmoving party "establish[es] genuinely disputed material facts

by 'citing to particular parts of materials in the record . . . or . . .  showing that the materials cited

do not establish the absence . . . of a genuine dispute.'"  *United Specialty Ins. Co. v. Cole's Place,*

*Inc.*, 936 F.3d 386, 403 (6th Cir. 2019) (quoting Fed. R. Civ. P. 56(c)(1)).  The Court must

evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-

moving party.  *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002); *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC,*

*LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine factual issue for trial.  *Anderson*, 477 U.S. at

249.  The trial court need not search the entire record for material issues of fact, *Street v. J.C.*

*Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[f]acts that are not blatantly contradicted by [the evidence] remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House*, *Tenn*., 634 F.3d 865, 870 (6th Cir. 2011). "In response to a properly supported summary judgment motion, the non-moving party 'is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Maston v. Montgomery Cnty. Jail Med. Staff Pers*., 832 F. Supp. 2d 846, 849 (S.D. Ohio 2011) (quoting *Sixty Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).

A fact is "material" if its resolution will affect the outcome of the lawsuit. *Beans v. City of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *5 (N.D. Ohio Dec. 30, 2016), *aff'd,* No. 17-3088, 2017 WL 3726755 (6th Cir. 2017) (citing *Anderson*, 477 U.S. at 248). The party who seeks summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 322. To make its determination, the court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968).

C.  Analysis

Case moves for summary judgment on his declaratory judgment claim (Count VI), conversion claim related to the Policy and TD Ameritrade Roth IRA (Count II), and civil liability claim (Count III).  Stewart moves for summary judgment on all of Case's claims.  The Court begins with the counts of Case's amended crossclaim on which both parties move for summary judgment (Counts II, III, and VI), then addresses the remaining counts.

1.  Declaratory judgment (Count VI)

Case seeks a declaratory judgment stating that the decedent's changes to the Policy and TD Ameritrade Roth IRA beneficiary designations were invalid.  Case argues that an attempt to change a beneficiary designation in violation of a domestic relations court's TRO is ineffective under Ohio law.  Stewart argues in response that a decedent's intent is the predominant consideration in an interpleader action such as this.  Stewart also emphasizes that the decedent initiated the changes to her beneficiary designations prior to the entry of the TRO, even if the paperwork was finalized afterwards.  Case argues in reply that none of Stewart's cited authority involved a TRO or other order expressly prohibiting a beneficiary designation change.

The Declaratory Judgment Act states:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  The Court considers five factors in assessing whether to exercise jurisdiction under the Declaratory Judgment Act:

> (1) whether the declaratory action would settle the controversy;
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;"

9

(4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
(5) whether there is an alternative remedy which is better or more effective.

*Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 29 F.4th 792, 796-97 (6th Cir. 2022) (quoting *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)).  The factors need not be afforded equal weight; rather, district courts are to "take[] a good look at the issue and engage[] in a reasoned analysis of whether issuing a declaration would be useful and fair." *Id.* (quoting *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014)).

Case argues that a declaratory judgment would settle a primary issue in this action: the lawful beneficiary of the Policy and TD Ameritrade Roth IRA.  Thus, while not settling the controversy entirely (factor 1), a declaratory judgment on this issue would certainly clarify a central legal issue in this case (factor 2).  Case did not initiate this action in this Court, and there is no evidence of "procedural fencing" or other "unfair or unseemly" tactics (factor 3).  *Id.* (quoting *Hoey*, 773 F.3d at 761).  There is no state court litigation concerning the Policy or TD Ameritrade Roth IRA (factor 4).  Finally, Case argues that a declaratory judgment would be most efficient (factor 5).  Stewart does not address these factors.  In her opposition to Case's motion as well as in her own motion, Stewart focuses on the underlying legal issue of the proper beneficiary.

Particularly given the absence of opposition by Stewart, the Court finds that the *Grand Trunk* factors weigh in favor of exercising jurisdiction under the Declaratory Judgment Act in this case for the reasons presented by Case.

Under Ohio law, the decedent's beneficiary designation changes to the Policy and TD Ameritrade Roth IRA were invalid due to the valid domestic relations court TRO in effect at the time they were completed.  In *Mack v. Allstate Life Ins. Co.*, 536 N.E.2d 671 (Ohio Ct. App. 1987), the decedent had designated his wife as the primary beneficiary of a life insurance policy.

*Id.* at 672. The wife subsequently filed for divorce and obtained a TRO that "restrained him from transferring, disposing of or affecting in any manner any interest either party might have in any tangible or intangible asset, including life insurance policies." *Id.* at 672-73. After the issuance of that TRO, the decedent attempted, unsuccessfully, to change the primary beneficiary on his life insurance policy to his sister prior to his death. *Id.* Although the court found that the decedent clearly intended to change the beneficiary, it could not allow "the insured's 'clearly expressed intent' to prevail over a valid court order" because such a result would "subvert the TRO issued by the domestic relations division and render it null and void." *Id.* at 673-74. *See also Minnesota Life Ins. Co. v. Birney*, No. 2:15-cv-2693, 2017 WL 106902, at *7 (S.D. Ohio Jan. 11, 2017) (following *Mack* and holding that the decedent "was subject to a valid restraining order at the time he changed the beneficiary of his existing life insurance policies. . . ."); *Midland Nat. Life Ins. Co. v. Manges*, No. 3:10-cv-191, 2010 WL 5394730, at *4-5 (S.D. Ohio Dec. 2, 2010) (report and recommendation) (following *Mack* and collecting authority holding that state court judgments must be given full faith and credit by subsequent reviewing federal courts under 28 U.S.C. § 1738) ("Ohio courts would treat any attempt to change the beneficiary of a life insurance policy in violation of a restraining order of the domestic relations court as ineffective."), *adopted*, 2010 WL 5394865 (S.D. Ohio Dec. 21, 2010); *Bartlett v. SunAmerica Life Ins. Co.*, No. L-09-1124, 2010 WL 1731231, at *3 (Ohio Ct. App. April 30, 2010) ("[T]here was a valid court order in effect preventing Bartlett from removing his wife as beneficiary on his life insurance policy and his IRA, a valid court order which Bartlett blatantly disregarded. Accordingly, . . . the trial court did not err in awarding [his wife] the proceeds. . . ."); *Concepcion v. Concepcion*, 722 N.E.2d 176, 181 (Ohio Ct. App. 1999) (following *Mack* and noting that the domestic relations court's order had the purpose of "the preservation of the *status quo* between the divorce action, until a final adjudication of the parties' property rights could be made"); *Vitas*

11

*v. John Hancock Mut. Ins. Co.*, No. C.A. 4030, 1987 WL 6170, at *2 (Ohio Ct. App. Feb. 4, 1987) ("When, during the existence of a temporary restraining order, granted by the domestic relations court during divorce proceedings, . . . Mr. Vitas . . . changed the beneficiary of his policy of insurance from his wife to his brother, he violated the order of the court.").[9]

Stewart's position to the contrary relies on the following decision from the Supreme Court of Ohio:

> We hold that when the custodian of an individual retirement account files an interpleader action against the parties claiming to be the beneficiaries of the account, the custodian waives its contractual change-of-beneficiary procedures, and a person who proves that the owner of the account clearly intended to designate him or her as the beneficiary does not also need to prove that the owner substantially complied with the change-of-beneficiary procedures in order to recover. Instead, the account owner's clearly expressed intent controls.

*LeBlanc v. Wells Fargo*, 981 N.E.2d 839, 840 (Ohio 2012). Stewart cites other cases in which a decedent's clearly expressed intent trumped an insurance company's formal procedures regarding the designation of a beneficiary. *See, e.g.*, *Colonial Life & Accident v. Leitch*, No. 24263, 2008 WL 5244588, at *3 (Ohio Ct. App. Dec. 17, 2008); *Williams v. Am. Mut. Life Ins. Co.*, No. 96-T-5478, 1996 WL 760908, at *5 (Ohio Ct. App. Dec. 6, 1996). None of the cases on which Stewart relies, however, concern the critical fact at issue here: a valid TRO expressly prohibiting any change in beneficiary designations at the time they were executed. (*See* TRO, Doc. 74-10 at PAGEID 1320).

Stewart also argues that she initiated the beneficiary designation changes prior to the issuance of the TRO. But Stewart cites no authority suggesting that this fact would change the

---

[9]In *Hook v. Hook*, 519 N.E.2d 687 (Ohio Ct. App. 1987), the court held that a party's death abates divorce proceedings, including temporary restraining orders. *Id.* at 691. Based on that, the court held that the decedent's beneficiary designation change during the pendency of a temporary restraining order was valid. This interpretation appears to be an outlier. *See, e.g.*, *Concepcion*, 722 N.E.2d at 180-81 (disagreeing with *Hook*), and *Birney*, 2017 WL 106902, at *6 (same).

application of the Ohio law summarized above. Absent such authority, the Court is bound to give full faith and credit to the TRO issued by the domestic relations court here and find invalid the beneficiary designation changes made contrary to its express provisions. *See* 28 U.S.C. § 1738; *Mack*, 536 N.E.2d at 673-74. As such, the Court holds that Case is the lawful beneficiary of the Policy and TD Ameritrade Roth IRA proceeds as a matter of law. Case's motion for summary judgment on his declaratory judgment claim (Count VI) is granted, and Stewart's motion is denied.

### 2. Conversion (Count II)

Case argues that the foregoing conclusion establishes that he had a property interest in the Policy and the TD Ameritrade Roth IRA. He argues that Stewart took action inconsistent with his rights, and that he need not show that she took this action with wrongful purpose or intent to maintain his conversion claim.

Stewart argues in response that she has never had dominion or control over the proceeds of the Policy. She also argues that Case cannot show that he suffered damages with respect to the Policy, as the proceeds therefrom are on deposit with this Court pending the disposition the action. (*See* Docs. 23, 26). As for the TD Ameritrade Roth IRA, Stewart argues that her mere claim of ownership cannot support Case's conversion claim. Finally, Stewart argues that even if the Court concluded that she converted these IRA proceeds, the damages are limited to the amount that she received: $6,146.93.

Case argues in reply that Stewart was not entitled to the proceeds of either the Policy or TD Ameritrade Roth IRA due to the TRO. He maintains that Stewart withheld the proceeds of the Policy, causing damages. He further argues that the record evidence establishes that TD Ameritrade disbursed the *full amount* of the Roth IRA to Stewart's separate account before Stewart or TD Ameritrade distributed the proceeds to her other siblings.

13

"Conversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Semco, Inc. v. Sims Bros., Inc.*, No. 9-12-62, 2013 WL 5347400, at *8 (Ohio Ct. App. Sept. 23, 2013) (quoting *Warnecke v. Chaney*, 956 N.E.2d 908, 912 (Ohio App. 3d Dist. 2011)). "The elements of conversion are: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Id.* (quoting *Miller v. Cass*, No. 3-09-15, 2010 WL 1740891, at *8 (Ohio App. 3d Dist. May 3, 2010)). "Wrongful purpose or intent is not a necessary element of conversion; thus, a defendant is liable even if he is acting under a misapprehension or mistake." *State Farm Mut. Auto Ins. Co. v. Loken*, No. 04-CA-40, 2004 WL 2260709, at *6 (Ohio Ct. App. Sept. 20, 2004) (citing *Fulks v. Fulks*, 121 N.E.2d 180, 182 (Ohio Ct. App. 1953)).

### a.  The Policy

Because Case is the lawful beneficiary of the Policy proceeds, he has established the first element of his conversion claim as to this property.  *Cf. Poston on behalf of Poston v. Shelby-Love*, 95 N.E.3d 659, 663 (Ohio Ct. App. 2017) ("The conversion claim fails because Craig never had a possessory interest in the account or its proceeds—he was never *named as a beneficiary* of the account. . . .") (emphasis added).

To satisfy the second element of his conversion claim, Case need not show "actual appropriation" by Stewart.  *Baltimore & O. R. Co. v. O'Donnell*, 32 N.E. 476, 478 (Ohio 1892). But Case must show that Stewart either "exercise[d] . . . dominion over property to the exclusion of the owner" or "with[eld] it from his possession. . . ."  *Semco, Inc.*, 2013 WL 5347400, at *8 (quoting *Warnecke*, 956 N.E.2d at 912).  Black's Law Dictionary defines "dominion" as "[c]ontrol; possession[.]"  *Dominion*, BLACK'S LAW DICTIONARY (11th ed. 2019).  *See also*

14

*Dominion*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/dominion (last visited March 12, 2024) [perma.cc/8As5-7GUN] ("law: absolute ownership"). Merriam-Webster defines "withhold," as relevant here, as "to keep in custody" or "to refrain from granting, giving, or allowing[.]" *Withhold*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/withhold (last visited March 12, 2024) [https://perma.cc/K8GZ-RRTA].

In his reply, Case seems focus on the "withhold" element of the conversion definition. But Stewart never had the Policy's proceeds in her custody such that she could control whether or not they were granted, given, or allowed to Case. (*See* Docs. 23, 26). Case does not identify authority in which merely making a claim for insurance benefits was held tantamount to an "exercise of dominion" over or "withholding" of property. *Cf. Kmatz v. Metro. Life Ins. Co.*, No. 1:04-cv-436, 2006 WL 1209362, at *13 (S.D. Ohio May 4, 2006) ("the Estate has not shown that [the beneficiary's] *acceptance of the Proceeds* was a wrongful act or disposition.") (emphasis added), *aff'd*, 232 F. App'x 451 (6th Cir. 2007).

Even if Stewart "withheld" or "exercised dominion" over the Policy, however, Case also fails at the third element. "The general measure of damages for conversion under Ohio law is 'the value of the converted property at the time it was converted.'" *McCaughey v. Garlyn Shelton, Inc.*, Nos. 1:02-cv-732, 1:02-cv-767, 2008 WL 150017, at *6 (S.D. Ohio Jan. 14, 2008) (quoting *State Farm Mut. Auto. Ins. Co. v. Advanced Impounding & Recovery Servs.*, 848 N.E.2d 534, 538 (Ohio Ct. App. 2006)). The alleged conversion of the Policy occurred just prior to the decedent's death when its value to Case remained contingent. Case fails to cite authority in which a court assessed damages equivalent to the full amount of an insurance policy benefit under circumstances such as these. Case argues that "Ohio courts have substituted, *when appropriate*, replacement cost for or repair cost of the property converted as the measure for damages in place of the market value for the property." *Id.* at *6 (emphasis added). But in

15

*McCaughey*, the property at issue was a vehicle, and Case offers no argument or authority to persuade the Court that replacement cost would be appropriate here.  To hold otherwise would result a double recovery: disbursement of the Policy's proceeds to Case pursuant to the declaratory judgment claim and a separate award pursuant to the conversion claim.  *Cf. Kryder v. Kryder*, No. 5:09-cv-2382, 2010 WL 425092, at *2 (N.D. Ohio Jan. 27, 2010) (holding that an intentional interference with expectancy of inheritance claim was not ripe and concluding that the plaintiff must first pursue probate procedures) ("[If the plaintiff was] permitted to pursue the two causes of action simultaneously, in two separate courts, there is a risk that [she] will receive a double recovery—the inheritance [she seeks] to reclaim in the will contest and money damages equal to the value of the inheritance in the tort action.") (alterations in original) (quoting *Roll v. Edwards*, 805 N.E.2d 162, 169 (Ohio Ct. App. 2004)).

Case fails to raise a genuine issue of material fact on the second and third elements of his conversion claim as it relates to the Policy.  Stewart's motion for summary judgment on this claim as to the Policy is granted, and Case's motion is denied.

### b.  TD Ameritrade Roth IRA

Because Case is the lawful beneficiary of the TD Ameritrade Roth IRA proceeds, he satisfies the first element of his conversion claim as to this property.  *See* Ohio Rev. Code § 3105.171(A)(3)(a)(i) ("'Marital property' means . . . all of the following: . . . the retirement benefits of the spouses . . . that was acquired by either or both of the spouses during the marriage. . . .").

For purposes of the second element, Stewart admits that she exercised dominion over the proceeds of the TD Ameritrade Roth IRA for purposes of the second element.  Stewart testified: "Q. And then with the 24,000 and some?  A. Oh, I divvied that up to everybody as well.  . . .  Q. The 24,000, when did you disburse that?  A. I actually had it -- I had the TD Ameritrade

16

accountant send checks out to everyone."  (Stewart Dep. 110:15-17, 111:2-6; Doc. 71-6 at

PAGEID 948-49).  In a post-deposition affidavit attached to her response to Case's motion,

Stewart attempts to clarify the details of these disbursements—in particular, to show that she

never received more than $6,146.93 from TD Ameritrade:

> 4. After my sister's death, TD Ameritrade split the proceeds of the Roth IRA between myself and my siblings.
>
> 5. On July 6, 2022, I received a distribution of $6,146.93 from TD Ameritrade.
>
> 6. On that same day, TD Ameritrade directly disbursed the remaining proceeds to my siblings, Luann Schirmer, Bernard W. Roeckers Jr., and Lynn P Davidson, in equal amounts of $6,146.91.

(Stewart Aff., Doc. 75-1 at PAGEID 3012, ¶¶ 4-6).

As to the damages element, Stewart argues that TD Ameritrade disbursed to her only her

one fourth share of the Roth IRA proceeds—her other siblings receiving equal shares.  Case

argues that the full amount of the proceeds initially came to her—established by the fact that the

TD Ameritrade beneficiary designation form lists *only* Stewart.  (*See* Doc. 71-3 at PAGEID 807-

09).[10]  Case also notes that the correspondence from TD Ameritrade attached to Stewart's post-

deposition affidavit regarding the disbursements of the Roth IRA proceeds to her siblings states:

"A disbursement or internal transfer of cash . . . *from your account* ending in 2218 was recently

completed."  (Doc. 75-1 at PAGEID 3014 (emphasis added)).  Case notes that the decedent's

account ended in 5352 (*see* Doc. 71-3 at PAGEID 807), which demonstrates that the decedent's

TD Ameritrade Roth IRA account funds had already been transferred to an account owned by

Stewart before these subsequent disbursements were made.  Finally, Case cites Stewart's

deposition testimony (Stewart Dep. 110:16-17, Doc. 71-6 at PAGEID 948 ("Oh, I divvied [the

---

[10] Stewart challenges the authenticity of this document, but it is notarized and therefore self-authenticating.  *See* Fed. R. Evid. 902(8); *Ingels*, 2022 WL 17252210, at *1.

24,000 and some] up to everybody as well."")) and testimony from Ms. Davidson and Ms. Schirmer consistent with this conclusion. (*See* Davidson Dep. 17:18-24, Doc. 71-4 at PAGEID 1403 ("Q. I understand that there -- you received approximately $6,000 as a result of a TD Ameritrade IRA account that Leslie had. Is that correct? A. Correct. Q. And who provided that to you? A. Lori."); Schirmer Dep. 78:15-25, Doc. 71-15 at PAGEID 1507 (Do you know the status of [the TD Ameritrade Roth IRA account] right now? A. I don't, but -- I don't. Q. Would you be surprised to learn that Lori has received it? A. No . . . because there was one that we divided up. . . . [W]e all got about $6,000.")).

There is no genuine issue of material fact that the entire proceeds of the decedent's TD Ameritrade Roth IRA were disbursed first to Stewart before going to her remaining siblings. All of the evidence supports this conclusion. Even assuming the reliability of Stewart's post-deposition affidavit,[11] in which she that states that "TD Ameritrade directly disbursed the remaining proceeds to my siblings" (Stewart Aff., Doc. 75-1 at PAGEID 3012, ¶ 6), this does nothing to establish that *the account from which* TD Ameritrade made these disbursements was *not* Stewart's. To the contrary, the exhibit correspondence attached to this affidavit and addressed to Stewart regarding "*your* [Stewart's] account ending in 2218" demonstrates that the funds were disbursed from Stewart's own account. (*See* Doc. 75-1 at PAGEID 3014 (emphasis added)). Case's motion for summary judgment on his conversion claim related to the TD Ameritrade Roth IRA is granted, and Stewart's motion is denied.

### c. *Other accounts*

As it relates to his conversion claim, Case's motion for summary judgment addresses only the Policy and TD Ameritrade Roth IRA. (*See* Doc. 71 at PAGEID 630 ("Stewart converted

---

[11] Case asserts that this affidavit contradicts Stewart's prior testimony. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (discussing the admissibility of post-deposition affidavits at summary judgment).

the life insurance policy and Roth IRA. . . ."), PAGEID 640 ("Stewart converted the Genworth Policy and TD Ameritrade Roth IRA.")). In Stewart's motion for summary judgment, she argues that "the only financial account at issue" as it relates to Case's conversion claim "is the TD Ameritrade Roth IRA" (Doc. 74 at PAGEID 1927), notwithstanding other allegations (*see* Am. Cross-cl., Doc. 59 at PAGEID 562, ¶¶ 22-23). Stewart supports this assertion with the following testimony by Case:

> Q. Do you believe there are any funds that [Stewart] has in her possession that belong -- to that should belong to you?
>
> A. In her possession that should belong to me. She was awarded the TD Ameritrade account that I was the beneficiary of. Subsequently learned that she does not have all of that at this point because she divided it amongst her siblings, so I guess the in her possession would be a point of contention but that -- that account specifically at this point.
>
> Q. Any other financial accounts that you believe [Stewart] has control over that should belong to you?
>
> A. That she has control over at this point? No, I don't believe so.

(Case Dep. 97:3-19; Doc. 74-1 at PAGEID 2031). In his response to Stewart's motion for summary judgment on his conversion claim, Case does not challenge this conclusion and reiterates that his claim relates only to the Policy and the TD Ameritrade Roth IRA. (*See* Doc. 77 at PAGEID 3023-24). Summary judgment is therefore appropriate in favor of Stewart on Case's conversion claim as related to any funds other than the TD Ameritrade Roth IRA.

### 3. Civil liability (Count III)

Case argues that he is entitled to summary judgment on his civil liability claim.[12] In particular, he argues that Ohio Revised Code § 2307.60 provides for a civil action for damages caused by certain criminal acts, including criminal theft.

---

[12] As with his conversion claims, Case analyzes his civil liability claim as it relates to the Policy and TD Ameritrade Roth IRA. (*See* Doc. 71 at PAGEID 630, 642-48).

In response, Stewart argues that the evidence that Case relies on to support his Ohio Revised Code § 2307.60 claim is contested. Stewart argues that Case's claim is premised on her alleged undue influence over the decedent, which is both not a criminal act and not supported by the evidence. Stewart's own motion for summary judgment on this claim focuses on this argument. Stewart argues that Case does not cite case law applying Ohio Revised Code § 2307.60 under similar circumstances.

In reply, Case argues that his civil theft claim is not based on undue influence. Case highlights evidence suggesting that Stewart flouted the TRO, took actions using the decedent's POA after the decedent died, and made misrepresentations to both Genworth and TD Ameritrade in order to secure the Policy and TD Ameritrade Roth IRA proceeds for herself. Case argues that this and other evidence, which he compiles in his motion and response to Stewart's motion on this claim, demonstrate that Stewart's actions were intentional. (*See* Doc. 71 at PAGEID 645-48; Doc. 77 at PAGEID 3024-26).

In *Jacobson v. Kaforey*, 75 N.E.3d 203 (Ohio 2016), the Supreme Court of Ohio held that "R.C. 2307.60 creates a civil cause of action for damages resulting from any criminal act, unless otherwise prohibited by law." *Id.* at 207. Thus, a property owner may bring a civil action under Ohio Rev. Code § 2307.60(A) "to recover damages from any person . . . who commits a theft offense, as defined in section 2913.01 of the Revised Code, involving the owner's property. . . ." *Semco, Inc.*, 2013 WL 5347400, at *3 (quoting Ohio Rev. Code § 2307.61(A)). Case "need not allege an underlying criminal conviction in order to state a claim for civil action for damages or a criminal act." *Foster v. Health Recovery Servs., Inc.*, 493 F. Supp. 3d 622, 642 (S.D. Ohio 2020) (citing *Buddenberg v. Weisdack*, 161 N.E.3d 603, 606 (Ohio 2020)).

Case relies on the following Ohio criminal theft statute as the basis for his civil liability claim:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception;

(4) By threat;

(5) By intimidation.

Ohio Rev. Code § 2913.02. Case focuses on the third subsection: deception. Because Ohio Revised Code § 2307.60 provides a civil remedy, Case is not required to prove this underlying criminal act beyond a reasonable doubt. *Roseman Bldg. Co., LLC v. Vision Power Sys., Inc.*, No. 2009CA00009, 2010 WL 310586, at \*5 (Ohio Ct. App. Jan. 25, 2010) (citing *H & W Door Co. v. Stemple*, No. 93-P-0031, 1994 WL 116257, at \*2 (Ohio Ct. App. Mar. 31, 1994)).

For purposes of the criminal theft statue, the "owner" is defined as "any person . . . who is the owner of, who has possession or control of, or who has any license or interest in property or services, even though the ownership, possession, control, license, or interest is unlawful." Ohio Rev. Code § 2913.01(D). "Deprive" means to do any of the following:

(1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration;

(2) Dispose of property so as to make it unlikely that the owner will recover it;

(3) Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration.

*Id.* at § 2913.01(C). "Deception" means:

21

> knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact.

*Id.* at § 2913.01(A).

The Court concludes that Case is the owner of the Policy and TD Ameritrade IRA for purposes of the criminal theft statute for the reasons explained above. As to the Policy, consistent with the Court's conclusion above, Stewart did not deprive Case of this property because she did not withhold the Policy's proceeds; dispose of the proceeds such that they were unlikely to be recovered; or accept, use, or appropriate the proceeds without consideration. *See infra* part C2a; Ohio Rev. Code § 2913.01(D). As such, the Court finds that Case's motion for summary judgment is denied on his civil theft claim as it relates to the Policy, and Stewart's motion is granted.

As to the TD Ameritrade Roth IRA, questions of fact preclude entry of summary judgment on the civil theft claim for either party. Case references a host of evidence that he believes supports summary judgment on this claim. Without addressing each piece of evidence referenced, the Court explains below why genuine issues of material fact remain as to whether Stewart *purposefully* deprived Case of the TD Ameritrade Roth IRA through *deception* for purposes of his civil theft claim.

Case points to evidence that Stewart had a plan to remove the decedent from the marital home weeks before May 2, 2022. He cites Stewart's deposition testimony about such plan (Stewart Dep. 41:10-43:17, Doc. 71-6 at PAGEID 879-81) and testimony and text messages from the decedent's friends showing that the decedent had made plans with them after May 2, 2022. (Hellman Dep. 34:1-13, Doc. 71-7 at PAGEID 1149; Ertel Dep. 45:10-19, Doc. 71-8 at

PAGEID 1226; Doc. 71-18; Doc. 71-19).[13]  But Stewart's testimony does not prove that it was

solely Stewart's plan.  (*See* Doc. 71-6 at PAGEID 879, 41:10-22 ("A. *We* . . . already had a plan

in place that she was going to leave.  . . .  Q.  . . .  Who developed the plan?  A. *She* did.")

(emphasis added)).  Moreover, the fact that the decedent may have made plans with her and

Case's friends after May 2, 2022 does not prove that she did not wish to leave the marital home.

Case argues that Stewart and her sister, Ms. Schirmer, developed a scheme going back to

at least March of 2022 to cut him out of any inheritance.  Case relies on text messages where

Stewart and Ms. Schirmer appear to discuss the decedent's finances.  (*See* Doc. 77-1 (text

messages between Stewart and Ms. Schirmer) ("Just make sure you find out if she can get out of

this?  If he has to include his inheritance if she includes hers?  And if this gives him full access to

change her will, like the inheritance?  . . . "[H]e is trying to be sickeningly nice. . . .")).  These

messages, however, while not flattering, do not prove a scheme to disinherit Case.

Case references various testimony showing that Stewart isolated the decedent following

her removal from the marital home (Stewart Dep. 77:20-80:4, Doc. 71-6 at PAGEID 915-18;

Schirmer Dep. 61:10-62:3, Doc. 71-15 at PAGEID 1490-91), exerted control over bank accounts

(Stewart Dep. 125:11-126:19, Doc. 71-6 at PAGEID 963-64), and controlled the divorce

proceedings (Stewart Dep. 81:7-16, 94:12-95:16, Doc. 71-6 at PAGEID 919, 932-33).  But

Stewart and Ms. Schirmer's testimony could reasonably be read to show that the decedent was

surrounded by family (Stewart Dep. 79:22-80:8, Doc. 71-6 at PAGEID 917-18 (the decedent's

brother and sisters and nieces and nephews visited)), it was the decedent's decision to remain

isolated from colleagues (Schirmer Dep. 62:1-3, Doc. 71-15 at PAGEID 1491 ("Q. Did any of

---

[13] Stewart challenges the authenticity of the text messages, but Ms. Hellman and Ms. Ertel authenticated them at their depositions.  (*See* Hellman Dep. 32:17-33:6, Doc. 71-7 at PAGEID 1147-48; Ertel Dep.44:24-46:9, Doc. 71-8 at PAGEID 1225-27).

[the decedent's Proctor & Gamble] colleagues come by? A. No. [The decedent] didn't want them to.")), the decedent asked for Stewart to accompany her to the bank (Stewart Dep. 125:16-126:3, Doc. 71-6 at PAGEID 963-64 ("Q. When did [you go with the decedent to close the decedent's PNC accounts and transfer them to Fifth Third]? A. . . . [The decedent] said, I want to go get my new account set up so that my paychecks can get transferred to my new account.")), and the decedent asked Stewart for an attorney recommendation (Stewart Dep. 81:9-10, Doc. 71-6 at PAGEID 919 ("A. [The decedent said], do you know a good divorce attorney.")).

Case references the fact that Stewart hired attorney Norton for the POA, and attorney Norton neither represented the decedent nor determined her capacity. (Norton Dep. 9:19-10:11, 20:6-13, Doc. 71-12 at PAGEID 1335-36, 1346). But attorney Norton also testified that the decedent expressed her wish to revoke Case as the POA. (*Id.* at 9:21-25, 17:5-12, PAGEID 1335, 1343). In addition, Stewart points to the testimony of Mr. Litts, who witnessed the decedent's signatures on the beneficiary designation forms for the Policy and TD Ameritrade Roth IRA:

> A. Although we did not at any point in time discuss her marriage, she told me that she had already taken care of her husband and she wanted to do something for her family and that she loved them very much and that she felt very comfortable and very good and safe where she was.
>
> Q. So when you said she said she had already taken care of her husband, what did you take that to mean?
>
> A. It could have meant a lot of things. It could have meant that -- this is only one beneficiary designation. I -- you know, she could have had other things. I know that she probably had a home. I don't know really. But I'm sure that other things were left to him. She did not discuss with me her marriage at all. I never knew her or her husband, and I still don't know them -- or her husband, I've never met him. And that's – she told me this is something she wanted to do for her family. And there's -- I'll be very adamant about that because she was very clear about that.
>
> . . . .

Q. Okay. And then the questions regarding her state of mind, did you, again ask her if she was happy and felt safe and comfortable where she was?

A. Well, we covered it a little bit quicker this time because my family was waiting for me.  But the part that I really wanted to hammer home was that she understood that she was changing the beneficiary of a policy so that her husband wouldn't get the money, but that her family would get it.

Q. Okay.

A. And she said -- and that she said that that's exactly what she wanted.

(Litts Dep. 38:1-25, 61:8-21, Doc. 74-8 at PAGEID 2863, 2886).  (*See also* Reynolds Dep.

50:16-19, 51:13-18, Doc. 74-6 at PAGEID 2710 ("Q. . . . [The decedent] told you that she

wanted to update her POA to her sister [Stewart], correct?  A. Yes. . . .  Q. Do you think part of

[the decedent's] wish was to have her beneficiary changes -- changed to her sister [Stewart]?  A.

Yes.  And she mentioned then just having [Stewart] distribute to other . . . people or charitable

causes. . . .")).

Case argues that Stewart deliberately flouted the TRO.  He relies on Stewart's testimony

that she "looked at" the divorce paperwork and attorney Nye's affidavit, in which he states that

he expressed concern with the fact that the decedent changed her beneficiaries while the TRO

was in effect.  (Stewart Dep. 115:14-21, Doc. 71-6 at  PAGEID 953; Nye Aff., Doc. 71-10 at

PAGEID 1307, ¶ 13).  Stewart also testified, however, that she "knew [the decedent] had filed

for divorce, but [she] did not know about [the TRO]."  (Stewart Dep. 161:12-13, Doc. 71-6 at

PAGEID 999).  And attorney Nye warned Stewart that the changes to the beneficiary

designations might violate the TRO only *after* they had already been made.  (*See* Nye Aff., Doc.

71-10 at PAGEID 1307, ¶ 13).

Case refers to his own testimony as well as the testimony of one of the decedent's

friends, Stewart, and Stewart's siblings to demonstrate that Stewart purposefully concealed the

decedent's passing by not publishing an obituary, holding a private service, and not including

Case's name on the decedent's death certificate.  But the testimony cited is not conclusive.  For

example, Stewart testified:

> Q. Why was there no obituary published?
>
> A. [The decedent] -- she said she just wanted to have a private service.  She said she didn't want -- she remembered when we -- when my other sister passed away, we tried to have a private service for her and we had it noted in the newspaper, and suddenly all kind of people showed up that we weren't expecting.  Because even -- I guess even though it says a private service, apparently a lot of people think it's okay if they just come.
>
> Q. Okay.  Did you publish an obituary after the service?
>
> A. We did not.  We talked about that, but so much was going on -- to be honest, she got sick so quickly and things happened so quickly at the end that --
>
> Q. Is it your testimony that none of these decisions had anything to do with keeping the information of [the decedent]'s death from [Case]?
>
> A. She -- all we knew is that she said she never wanted to see him again.  That was the last that she had spoken of him to us.
>
> Q. And no one told [Case] anything regarding the progression of her disease and even her passing?
>
> A. No.  I think things happened so quickly at the end, I think we were all overwhelmed.  I know I was.  I didn't expect things to go south so quickly like they did.

(Stewart Dep. 98:18-99:23, Doc. 71-6 at PAGEID 936-37).  (*See also* Davidson Dep. 19:12-21,

Doc. 71-14 at PAGEID 1405 ("A. [The decedent] wanted a private ceremony with her immediate

family. . . . Q. . . . [W]hy no record of her death? . . . A. . . . [The decedent] said that was her

wish.")).  Stewart testified that the omission of Case from the decedent's death certificate was a

"typo" and her "mistake."  (Stewart Dep. 99:24-100:3, Doc. 71-6 at PAGEID 937-38).

As the foregoing demonstrates, the parties present vastly different accounts of what

motivated Stewart's actions in the weeks and months prior to the decedent's death.  Genuine

issues of material fact prevent the Court from entering summary judgment on Case's civil liability claim related to the TD Ameritrade Roth IRA for either party.

4.   Tortious interference with expectancy of inheritance (Count I)

Stewart argues as a threshold matter that Case was required to exhaust his remedies in probate court prior to bringing this claim.  Stewart also argues that Case cannot show her fraud or undue influence over the decedent.  Finally, Stewart argues that Case cannot show with reasonable certainty that, but for the alleged misconduct, he would have received the proceeds of the Policy and TD Ameritrade Roth IRA.

Case argues in response that he was not required to exhaust his remedies in probate court because the Policy and TD Ameritrade Roth IRA are not probate assets.  Case also argues that he proffered the expert report of a board certified forensic psychiatrist supporting his position that Stewart exerted undue influence over the decedent, among other evidence of her tortious conduct.  He also argues that Stewart's case authority in support of her argument that she did not unduly influence the decedent either relates to a different legal concept (testamentary capacity) or was in a different procedural posture (post-bench trial).

In reply, Stewart does not attempt to rebut Case's argument that he was not required to exhaust his remedies in probate court.  Stewart instead contests Case's characterization of evidence supporting this claim.  She asserts that her conduct was not fraudulent, and she did not unduly influence the decedent.

The elements of intentional interference with expectancy of inheritance are:

(1) an existence of an expectancy of inheritance in the plaintiff; (2) an intentional interference by a defendant(s) with that expectancy of inheritance; (3) conduct by the defendant involving the interference which is tortious, such as fraud, duress or undue influence, in nature; (4) a reasonable certainty that the expectancy of inheritance would have been realized, but for the interference by the defendant; and (5) damage resulting from the interference.

*Firestone*, 616 N.E.2d at 203 (Ohio 1993).

At the outset, the Court agrees that Case was not required to exhaust this claim in probate court prior to bringing it here. *See In re Est. of Perry*, 2008 WL 282067, at *3 (Ohio Ct. App. Feb. 4, 2008) ("Proceeds payable to a named beneficiary in a life insurance policy are not included in a decedent's probate estate.") (citing *Adams v. Adams*, No. CA2002-09-087, 2003 WL 2168002, at *3 (Ohio Ct. App. July 14, 2003) (in turn citing *In re Gatch's Estate*, 92 N.E.2d 404, 405 (Ohio 1950))); *Hutson v. Uplands Vill.*, No. 3:19-cv-65, 2019 WL 4928896, at *3 (S.D. Ohio Oct. 7, 2019) ("[T]ransfer-on-death agreements routinely are used as vehicles to transfer assets outside of probate, with the result being that such assets are non-probate assets."); *In re Estate of Strauss*, No. 08-COA-19, 2010 WL 759233, at *2 (Ohio Ct. App. Mar. 4, 2010) ("[A] substantial portion of the assets bec[ame] non-probate assets by virtue of being changed to payable on death accounts, transfer on death accounts, and/or joint and survivorship accounts.").

Turning to the claim itself, the parties focus on the third element: whether there is a genuine issue of material fact that Stewart's conduct related to the interference was "tortious, such as fraud, duress or undue influence, in nature. . . ." *Firestone*, 616 N.E.2d at 203. Undue influence, in turn, requires showings of: "(1) a susceptible party; (2) another's opportunity to exert [influence]; (3) the fact of improper influence exerted or attempted; and (4) the result showing the effect of such influence." *In re Est. of Flowers*, 88 N.E.3d 599, 621 (Ohio Ct. App. 2017) (alteration in original) (quoting *West v. Henry*, 184 N.E.2d 200, 208 (Ohio 1962)).

Case relies on the expert report of Dr. Timothy Allen, in which Dr. Allen concluded that the decedent "was suffering from psychological and physical conditions for many months before her death on May 31, 2022, which made her susceptible to undue influence by close family members, including [Stewart]. . . ." (Doc. 77-2 at PAGEID 3044). Stewart relies on *MacDowell v. DeCarlo*, No. 23281, 2007 WL 172123 (Ohio Ct. App. Jan. 24, 2007), in which the court

considered an appeal of a judgment *following a bench trial*, and determined that the trial court reasonably declined to accept the estate's medical expert's testimony that a cancer diagnosis typically makes a person susceptible to undue influence. *Id.* at *17. Instead, the Court found persuasive the testimony of a family doctor, who had repeatedly examined the decedent and found her to have no mental deficiencies. *Id.*

The Court finds that *MacDowell* supports the conclusion that Dr. Allen's expert report creates a genuine issue of material fact as to whether Stewart exerted undue influence over the decedent. This Court has held that, with respect to an intentional interference with expectancy of inheritance claim, "an evaluation of [a defendant's] actions and whether [a defendant] exerted influence over [a decedent] . . . involve a credibility determination concerning [the defendant], at the very least[,]" making the matter inappropriate for summary judgment. *Stewart v. Martin*, No. 3:21-cv-89, 2023 WL 2401720, at *10 (S.D. Ohio Mar. 8, 2023).

Here too, the credibility of Stewart and others who testified regarding the decedent's intent to change her Policy and TD Ameritrade Roth IRA beneficiary designations (Mr. Litts and Mr. Reynolds) are questions of fact material to determining whether Stewart unduly influenced the decedent. Without individually addressing each of the other "illegal and tortious" actions by Stewart alleged by Case (*see* Doc. 77 at PAGEID 3024-26 (collecting evidence)), the Court concludes that Dr. Allen's report alone creates a genuine issue of material fact on the third element of Case's tortious interference with expectancy of inheritance claim.

Stewart also asserts that Case has not raised a genuine issue of material fact as to the fourth element of this claim: whether there was reasonable certainty that Case would have received the proceeds of the Policy and the TD Ameritrade Roth IRA but for her interference. She does not, however, develop this argument in her briefing. It appears clear to the Court that Case has raised a genuine issue of material fact on this element: it is undisputed that Case

remained the beneficiary of the Policy and TD Ameritrade Roth IRA until just days before the decedent's death when the beneficiary designation changes were submitted to Genworth and TD Ameritrade.

Genuine issues of material fact remain with respect to Case's intentional interference with expectancy of inheritance claim.  Stewart's motion for summary judgment is denied as to this claim.

5.  <u>Intentional infliction of emotional distress</u>

In Stewart's motion, she argues that she did not intend to cause Case emotional distress; and the decedent herself decided to leave the marital home, file for divorce, remove Case as her POA, change her Policy and TD Ameritrade Roth IRA beneficiaries, and have a private funeral service.  Stewart also argues that her conduct was not extreme and outrageous, and that Case cannot show that she was the proximate cause of his emotional distress given his mother's passing, which occurred around the same time as the decedent's cancer diagnosis.  Finally, Stewart argues that Case has not raised a genuine issue of fact that his emotional distress was sufficiently serious to succeed on this claim.

Case argues in response that Stewart's argument relies on her own testimony and narrative, and much of the other evidence in the record suggests her culpable intent.  He also argues that the first element of an intentional infliction of emotional distress claim encompasses both intentional *and reckless* conduct.  In addition, Case argues that the causation determination is not appropriate for summary judgment disposition.  Finally, Case argues that Stewart ignores his lay and expert testimony regarding the severity of his emotional distress, which raises a genuine issue of material fact on this element of his claim.

30

In reply, Stewart emphasizes the "virtually insurmountable burden of proof" for this claim and argues that Case cannot prove that her conduct was "extreme and outrageous" as understood in this context. *Clay v. Shriver Allison Courtley Co.*, 118 N.E.3d 1027, 1045 (Ohio Ct. App. 2018). Stewart also reiterates her position that Case has not raised a genuine issue of material fact as to proximate causation.

> To make an intentional infliction of emotional distress claim, a plaintiff must show that:
>
> (1) the defendant intended to cause, or knew or should have known that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure.

*Woods v. Sharkin*, 192 N.E.3d 1174, 1200 (Ohio Ct. App. 2022) (quoting *Lombardo v. Mahoney*, No. 92608, 2009 WL 3649997, at *1 (Ohio Ct. App. Nov. 5, 2009)). "[L]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hale v. Vance*, 267 F. Supp. 2d 725, 736 (S.D. Ohio 2003) (quoting *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983)) (overruled on other grounds). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* (quoting *Yeager*, 453 N.E.2d at 671). "Conduct that is merely cruel or insensitive does not reach the threshold of the sort of extreme and outrageous conduct that is necessary to establish a claim of intentional infliction of emotional distress." *Hunt v. City of Toledo L. Dept.*, 881 F. Supp. 2d 854, 886-87 (N.D. Ohio 2012) (quoting *Roelen v. Akron Beacon Journal*, 199 F. Supp. 2d 685, 696 (N.D. Ohio 2002)).

Stewart's motion for summary judgment on this claim is denied. First, as discussed above, Stewart's intent is a vigorously disputed question of fact on which there is conflicting evidence—leaving aside the uncontested possibility that Stewart's actions could meet this element using a reckless standard.

On the elements of "extreme and outrageous" conduct and proximate causation, Stewart relies on *Clay*, in which the plaintiffs alleged a series of unprofessional and insensitive actions by various actors related to the handling of their mother's body after her death, including a frantic and improper transport to the funeral home and a series of issues with the funeral arrangements, preparation of the body, and burial. *Clay*, 118 N.E.3d at 1033-35. The court affirmed the entry of summary judgment against the plaintiffs on the intentional infliction of emotional distress claims, holding: "While Appellants were party to an escalating series of extremely distressing events, even they do not attribute their emotional upheaval to the action of one or the other of the individual defendants, but rather, to the combined effects of all defendants when taken in a continuum." *Id.* at 1046.

The Court finds that *Clay* is distinguishable because it turned primarily on the causation element. *See id.* at PAGEID 1045-46. Here, Case alleges that only Stewart's conduct was the proximate cause of his emotional distress. In addition, Case proffers testimony corroborating the extreme nature of the alleged conduct: "[W]e were all flabbergasted. . . . [T]his is weird. It's just weird. It's weird. It's like the Truman show or something. It's very strange. . . . [Y]ou can't make this up. [I]t needs to be on Dateline NBC. . . ." (Ertel Dep. 38:22-39:1, 39:25-40:1, Doc. 71-8 at PAGEID 1219-21). Even the *Clay* court seemed to allow that if all the actions were attributable to a single defendant, it could have been "actionable behavior." *Id.* at 1045.

In addition, while the death of Case's mother complicates the causation element, Case's testimony and the expert report of Peter J. Ganshirt, Psy.D., raise an issue of fact as to whether Stewart's actions were the proximate cause of his emotional distress.  (*See* Case Dep. 114:7-116:24, Doc. 74-1 at PAGEID 2049-51; Doc. 77-3 at PAGEID 3047-48).  Finally, Stewart is not immunized because Case suffered the prior, emotionally distressing death of his mother.  *See Caparanis v. Ford Motor Co.*, No. 1:13-cv-926, 2013 WL 6626839, at *8 (N.D. Ohio Dec. 16, 2013) (the plaintiff's history of depression did not necessarily preclude him from meeting the causation element of his intentional infliction of emotional distress claim); *Buckman-Peirson v. Brannon*, 822 N.E.2d 830, 837 (Ohio Ct. App. 2004) ("Despite past incidents of psychological problems or emotional trauma, [the plaintiff] had every right to pursue a properly supported claim for intentional infliction of emotional distress.").[14]

Finally, Case has raised an issue of material fact as to whether his emotional distress is serious.  Both expert testimony and lay testimony "about any 'marked changes in the emotional or habitual makeup'" of the claimant may be used to support this claim.  *Clay*, 118 N.E.3d at 1039 (quoting *Paugh v. Hanks*, 51 N.E.2d 759, 767 (Ohio 1983)).  Case relies on the report of Dr. Ganshirt, in which he states that Case has "irreparable and extreme psychological and emotional damage" due to Stewart's conduct.  (Doc. 77-3 at PAGEID 3048).  Dr. Ganshirt states:

> Case has consistently presented with significant dysphoria, his affect has been flat/blunted, moderate levels of anhedonia are problematic as he experiences little emotional satisfaction from his present life, he is perpetually unhappy and emotionally empty/hollow, and struggles with processing his emotions fearing that he will break down with uncontrollable grief.  He has insomnia and disruptive sleep, his level of energy is low and inconsistent, and he has intermittent anxiety attacks. Once happy and leading a productive life while married to [the decedent], he is a shadow of a man in comparison to his previous level of functioning.

---

[14] Stewart argues that the court affirmed the grant of summary judgment on the intentional infliction of emotional distress claim in this case, but this was because the plaintiff's causation evidence was limited to her own testimony. *Id.* at 841.

> [Case's] prognosis remains very guarded at this point in treatment.  [Case] continues to attend outpatient therapy due to the ongoing severe emotional distress he experiences on a daily basis.

(*Id.*).  Case also testified that he lost 20 pounds and has experienced depression and anxiety due to Stewart's actions.  (Case Dep. 114:7-23, Doc. 74-1 at PAGEID 2048).  Case and the decedent's friend and next-door neighbor described Case as "terrible" after these events.  (Ertel Dep. 43:3-10, Doc. 71-8 at PAGEID 1224).  The cases cited by Stewart in reply are distinguishable because the plaintiffs therein did not present expert testimony.  *See Powell v. Grant Med. Ctr.*, 771 N.E.2d 874, 879 (Ohio Ct. App. 2002); *Burks v. Torbert*, No. 91059, 2009 WL 280405, at *4 (Ohio Ct. App. Feb. 5, 2009).

Based on the evidence presented, a reasonable juror could find that Stewart's intentional or reckless actions caused Case to suffer from serious emotional distress.  Stewart's motion for summary judgment on this claim should be denied.

      6.  <u>Punitive damages</u>

Stewart argues that Case cannot assert a standalone claim for punitive damages.  She also argues that Case cannot demonstrate the actual malice necessary for an award of punitive damages because "everything [she] did was out of love for her dying sister."  (Doc. 74 at PAGEID 1932).

Case argues in response that he seeks punitive damages in connection with his intentional interference with expectancy of inheritance, conversion, and intentional infliction of emotional distress claims—each of which, as explained above, survive Stewart's motion.  Case also argues that his punitive damages claim is not only premised on actual malice but also aggravating and egregious fraud.

In Ohio, punitive damages may be awarded when "the actions or omissions of [a defendant in question] demonstrate malice or aggravated or egregious fraud. . . ." Ohio Rev. Code § 2315.21(C)(1).  Actual malice for purposes of punitive damages includes both "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm[,]" which connotes "extremely reckless behavior revealing a conscious disregard for a great and obvious harm." *Cabe v. Lunich*, 640 N.E.2d 159, 162 (Ohio 1994) (quoting *Preston v. Murty*, 512 N.E.2d 1174, 1175 (Ohio 1987)).  "[A]ctual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Villella v. Waikem Motors, Inc.*, 543 N.E.2d 464, 467 (Ohio 1989), *holding modified on other grounds by Moskovitz v. Mt. Sinai Med. Ctr.*, 635 N.E.2d 331 (Ohio 1994).  The policy behind punitive damages in Ohio is both punishment and deterrence. *Cabe*, 640 N.E.2d at 601-02.

The Court has determined that genuine issues of material fact remain with respect to Case's intentional interference with expectancy of inheritance and intentional infliction of emotional distress claims.  To ultimately succeed on these claims, Case must prove that Stewart intentionally and tortiously interfered with Case's inheritance, and that she intentionally or recklessly caused Case to suffer serious emotional distress.  These determinations overlap with the punitive damages analysis, which considers whether Stewart committed egregious fraud or whether her actions demonstrated hate, ill will, or extreme recklessness toward Case.  Stewart's motion for summary judgment as to the punitive damages component of Case's claims is therefore denied.

**IT IS THEREFORE ORDERED THAT:**

1. Case's motion for partial summary judgment (Doc. 71) is **GRANTED in part** and **DENIED in part** as explained herein.

2. Stewart's motion for summary judgment (Doc. 74) is **GRANTED in part** and **DENIED in part** as explained herein.

Date: 3/21/2024

Karen L. Litkovitz
United States Magistrate Judge